## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **BEVERLY PADGETT, Individually and as Administrator of the Estate of JARED PADGETT, Deceased, and JACOB PADGETT** | **PLAINTIFFS** |
| **VS.** | **JURY TRIAL REQUESTED** <br> **CAUSE NO.**3:26-cv-217-DPJ-ASH |
| **SIMPSON COUNTY, MISSISSIPPI; SHERIFF PAUL MULLINS, in his individual and official capacity as SHERIFF OF SIMPSON COUNTY, MISSISSIPPI; DEPUTY BILLY SEGHINI, in his individual and official capacity; DEPUTY JASON RUNNELS, in his individual and official capacity; DEPUTY EMANUEL THURMAN, in his individual and official capacity; DEPUTY MARVIN MILLER, in his individual and official capacity; and JOHN DOES 1-10, in their individual and official capacities,** | **DEFENDANTS** |

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS
## PURSUANT TO 42 U.S.C. § 1983

PLAINTIFFS BEVERLY PADGETT, individually and as Administrator of the Estate of JARED PADGETT, Deceased, and JACOB PADGETT, by and through undersigned counsel, bring this action against Defendants and state as follows:

## NATURE OF THE ACTION

1. This is a civil rights action arising from the mind-boggling, unlawful, excessive, and ultimately fatal use of force by Defendants, the Sheriff and named Defendant Deputies of the Simpson County Sheriff's Department, against Jared Padgett, a young man who was experiencing unusual mental confusion at his own home (the cause of which is unknown, due to blatant constitutional violations by Defendants, (including the failure to provide for any medical care for Jared both before and after he was shot to death).

2. Jared had committed no crime and posed no threat to law enforcement or anyone else. Beverly Padgett, his mother, and Jacob Padgett, his brother, called 911 asking for basic emergency assistance to help Jared reach a hospital and determine what was wrong, as Jared was behaving in an unusual manner, dressed in running shorts and running shoes, threatening no one but perhaps himself.

2

3.     What arrived in response to the Mother's plea for help for her son, instead, after more than an hour's delay, was Simpson County Sheriff's Department and its platoon of deputies, who proceeded to murder Jared for no apparent reason at all, other than a perverse concept of "law enforcement" that is itself pure lawlessness, an exercise of brute, mortal force inflicted to needlessly kill a young man who needed medical attention, not to be tased at least 16 times, and a his body needlessly pumped full of  bullets by Defendants, piercing his body and murdering him in cold blood.

4.     Upon arrival at the scene after Jared's Mother's call for medical assistance, the Defendants could easily have restrained Jared and waited for medical assistance to assist in determining why Jared was behaving oddly, as his mother had stated to the 911 operator on the phone.  Jared was committing no crime, but was acting unusual for a well-educated young man with a university degree in accounting with his sights set on working in the oil industry.

5.     Rather than initiating any type of restraint of Jared, who, again, had violated no law or posed a threat to anyone, or attempting to de-escalate the situation until medical help arrived (none did, because

none were called), the Simpson County Deputies seemed to taunt and then gratuitously tased Jared at least sixteen (16) times within approximately ten (10) minutes, repeatedly, even as he fearfully surrendered on his knees with his hands interlocked behind his head, begging not to be shot. Jared never exhibited any aggressive behavior, and was never once handcuffed or restrained in any way, despite multiple opportunities to do so for him to be given the proper medical attention that was never sought or provided.

6. After nearly killing him with brute, unnecessary force, the Defendants Simpson County Deputies, like Keystone Kops,[1] then allowed Jared to sit in the passenger's side front seat of a patrol car, with keys in the ignition, alongside an unsecured (but unloaded) AR-15 rifle, and left him there unattended. When Jared—dazed, bloodied, and in crisis from the repeated tasings and abuse—fled the scene in the patrol car, Deputy Jason Runnels pursued Jared to a nearby service station and fatally shot him to death, then left Jared laying in his blood on the concrete, without

---

[1] "Keystone Kops, an incredibly incompetent police force, dressed in ill-fitting, unkempt uniforms . . . appeared regularly in … silent-film slapstick farces from about 1912 to the early 1920s. They became enshrined in American film history as genuine folk-art creations whose comic appeal was based on a native irreverence for authority. What the Kops lacked in sense they made up for in zeal, as they dashed off to the chase on foot or drove off in a Tin Lizzie (one accommodated the entire force), in jerky, speeded-up tempo. Whether they collided with one another around corners or became entangled in clotheslines, ladders, or folding tents, their facial expressions of dour dignity never changed." https://www.britannica.com/topic/Keystone-Kops (last visited April 1, 2026).

4

so much as even requesting medical attention for Jared, who was eventually pronounced dead at the scene. At least two witnesses have reported that Jared was not threatening harm to anyone, but instead merely surrendered, and laid the AR-15 on the ground beside the car, not pointing it at anyone, when Runnels fired his barrage of fatal bullets into Jared's body.

3. This action is brought pursuant to 42 U.S.C. § 1983 for violations of rights secured by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, including the right to be free from unreasonable searches and seizures, excessive force, the right to adequate medical care while in state custody, and, most importantly, the right not to be killed and deprived of life or liberty without due process of law.

Plaintiffs further allege that the Simpson County Sheriff's Department's deliberate indifference to the constitutional rights of citizens is evidenced by Sheriff Mullins's hiring and retention of Deputy Runnels, who had a prior history of serious misconduct, including a fatal vehicular incident when working as a Smith County deputy. The Department and Sheriff's conduct with respect to all of the "Keystone

Kop" Defendants, is illustrative of the Department's failure to adequately equip, train, and supervise the Defendants.

## JURISDICTION AND VENUE

4.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights). Supplemental jurisdiction over any state law claims is proper under 28 U.S.C. § 1367, as those claims arise from the same common nucleus of operative facts.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). All events giving rise to Plaintiffs' claims occurred in Simpson County, Mississippi, which lies within the Southern District of Mississippi.

6.    At all material times, Defendants acted under color of state law, in bad faith, with malicious intents and purposes, and in reckless, wanton, and willful disregard of Jared Padgett's constitutional rights, including the ultimate right—not to be deprived of one's life without due process of law.

## PARTIES

7.    Plaintiff Beverly Padgett is the mother of Jared Padgett and the duly appointed Administrator of the Estate of Jared Padgett, Deceased. She is a resident of Simpson County, Mississippi. She brings this action individually and in her representative capacity on behalf of the Estate. Beverly Padgett was an eyewitness to the use of force against her son, standing within arm's reach of Jared when he was tased repeatedly for no reason at all.

8.    Plaintiff Jacob Padgett is the brother of Jared Padgett and a resident of Simpson County, Mississippi. Jacob Padgett, a registered nurse, was present at the scene throughout the incident and witnessed the repeated use of unlawful, deadly force against his brother. He brings this action in his individual capacity for the injuries he sustained as a result of Defendants' actions.

9.    Defendant Simpson County, Mississippi, is a political subdivision of the State of Mississippi. The Simpson County Sheriff's Department is an agency of Simpson County and is responsible for the policies, practices, and customs governing its deputies' use of force, training, supervision, discipline, and equipment.

7

10.    Defendant Paul Mullins is and was at all material times the Sheriff of Simpson County, Mississippi, the constitutional officer of the Simpson County Sheriff's Department, and the final policymaker with respect to law enforcement operations, use of force, and the training, hiring, and supervision of deputies. Sheriff Mullins was responsible for the hiring and retention of Deputy Runnels, and for the policies, practices, and customs governing the use of force, training, supervision, discipline, and equipment of all deputies.  Sheriff Mullins is sued in both his individual and official capacities.

11.    Defendant Billy Seghini is and was at all material times a Deputy Sheriff employed by the Simpson County Sheriff's Department. Deputy Seghini was the first responding officer, the first to deploy a taser against Jared Padgett, and the officer who, after Beverly Padgett explicitly expressed fear that Jared would die without medical help, chose not to summon urgent medical or mental health assistance for Jared. He is sued in both his individual and official capacities.

12.    Defendant Jason Runnels is and was at all material times a Deputy Sheriff employed by the Simpson County Sheriff's Department. Deputy Runnels is the officer who fatally shot Jared Padgett without

cause. Prior to his employment with Simpson County, Runnels was involved as a Smith County deputy in a fatal vehicular incident in which he struck and killed a child while operating a vehicle at an extremely excessive rate of speed and was not criminally charged. He is sued in both his individual and official capacities.

13.    Defendant Emanuel Thurman is and was at all material times a Deputy Sheriff employed by the Simpson County Sheriff's Department. Deputy Thurman was present throughout the initial use of force against Jared Padgett and participated in the ensuing pursuit. He is sued in both his individual and official capacities.

14.    Defendant Marvin Miller is and was at all material times a Deputy Sheriff employed by the Simpson County Sheriff's Department. Deputy Miller is the officer who allowed Jared Padgett—unrestrained, dazed, and physically impaired from repeated tasings—into the front passenger seat of his patrol vehicle, with keys left in the ignition and an unsecured AR-15 rifle on the seat, and then exited the vehicle and left Jared unattended therein. This decision, and the prior conduct of Defendants, directly and foreseeably created the dangerous and

ultimately deadly situation that Defendants later invoked to justify the use of lethal force. He is sued in both his individual and official capacities.

15.    Defendants John Does 1 through 10 are unnamed deputies or agents of the Simpson County Sheriff's Department or otherwise, whose identities are not yet known. Their identities will be established through discovery. They are sued in both their individual and official capacities.

## FACTUAL ALLEGATIONS

16.    In September of 2023, Jared Padgett was experiencing an acute mental health crisis of unknown origins, exhibiting paranoia, fear, and possible hallucinations consistent with having ingested an unknown substance or having an abnormal psychotic event. He was not armed, had committed no crime, and posed no threat to anyone. He wanted to go to the hospital.

17.    Beverly Padgett and Jacob Padgett called 911 to request help in transporting Jared to a hospital for treatment.  Beverly first reached the Magee Police Department, which redirected her to the Simpson County Sheriff's Department, because she was in "the county". Beverly and Jacob made specific and explicit requests: that deputies arrive without sirens, approach calmly, and assist in getting Jared to a hospital

rather than arresting him. They explained that Jared was frightened and confused, but had done nothing wrong to warrant being treated like a dangerous criminal.

18.  No law enforcement responded for over one hour after the initial call for assistance.

19.  When Deputies Seghini and Thurman finally arrived at the residence of Jacob Padgett, Beverly and Jacob again explained Jared's condition and requested that a 72-hour mental health hold be initiated so that Jared could receive medical care. Deputy Seghini refused, stating it was "too late" in the day and that because Jared had not broken a law, Seghini could "lose his job" for intervening. No immediate medical or mental health resources were requested. No de-escalation was attempted.

20.  At the time of the deputies' arrival, Jared was in or near outbuildings behind Jacob's residence, wearing only gym shorts and no shirt. He had no weapons and posed no physical threat.

21.  While Beverly, Jacob, Seghini, and Thurman were standing together in the front yard, Jared walked peacefully toward the group.

Without any apparent provocation, Deputy Seghini suddenly began yelling at Jared to "get down."

22.   Jared Padgett immediately and fully complied. He dropped to his knees, interlaced his fingers behind his head, and audibly pleaded: "Please don't shoot me. Please don't shoot me." Beverly Padgett was standing within arm's reach of her son. Jacob Padgett was standing within arm's reach of Deputy Thurman. Both witnessed Jared's complete and unambiguous surrender.

23.   Despite this full surrender, Deputy Seghini then commanded Jared to stand up. When Jared rose to his feet in obedience to that command, Seghini deployed his taser, striking Jared in the right shoulder. Beverly Padgett initially believed the sound was a gunshot due to its force.

24.   After being gratuitously tased, Jared fled on foot, bloody, dazed and confused. Multiple deputies, including Seghini and Thurman, pursued him. According to evidence obtained by Beverly Padgett, Jared was tased at least sixteen (16) times within approximately ten (10) minutes. At no point did any deputy attempt to restrain or handcuff Jared, despite the fact that he immediately surrendered, dropping to his

12

knees in the street, raising his hands in the air, while bloodied from the repeated tasings and beating.

25.    As this scene unfolded, Jacob Padgett drove to the scene after Jared fled from this needless and excessive force against his person. Jacob arrived to find numerous patrol vehicles and Jared in the middle of the road on his knees, hands raised, visibly dazed and bloodied. Jacob attempted from his truck to call Jared to him, encouraging him to get in, but was unable to reach him before deputies intervened.

26.    Defendant Deputy Marvin Miller allowed Jared a seat in the passenger's front seat of Miller's patrol car, unrestrained, severely impaired from repeated tasings, and in an acute mental health crisis. An AR-15 rifle was present in the vehicle and was not secured. Deputy Miller exited the vehicle, leaving Jared unattended in the front seat with an unsecured firearm. Jacob Padgett witnessed this occur.

27.    Jared Padgett, dazed and desperate to escape the officers who had been repeatedly tasing him, moved to the driver's seat and attempted to flee. Jacob attempted to block Jared's path with his truck. Two deputy vehicles collided with the patrol car in an apparent attempt to stop him, but Jared was able to exit onto the highway.

28.    Jared drove to a nearby, out-of-business service station and stopped. Deputy Jason Runnels was alleged to be the only law enforcement officer present when Jared arrived. There were no other witnesses to what occurred next.

29.    Deputy Runnels claimed to MBI investigator Dennis Weaver that Jared exited the patrol car with the AR-15 and appeared to be attempting to load it, and that Runnels immediately shot Jared multiple times, causing his death. The exact number of shots fired has never been disclosed to the Padgett family. No autopsy report has ever been provided to the Padgett family.

30.    Two independent sources separately informed Beverly Padgett and Jacob Padgett that, at the time Runnels executed his onslaught of bullets, Jared was leaning the AR-15 against the patrol car, not pointing it at anyone. One of those sources is Terry Tutor, the county coroner and owner of Tutor Funeral Home, who told the family he was originally informed that Jared exited the car and leaned the rifle against it before being shot.

31.    MBI investigator Weaver informed the family that the AR-15 was not typically kept loaded.    The family has never received

14

confirmation of whether the rifle was loaded at the time of the shooting. No investigation of the murder scene was apparently ever even conducted.

32.    Deputy Jason Runnels was not placed on administrative leave following the shooting. He was married the day after the incident and departed on a honeymoon. In the days following, multiple witnesses reported that Runnels was openly disparaging Jared Padgett to neighbors.   Runnels also called the Magee Police Department on a separate occasion when Jacob Padgett was present in the same store as Runnels, claiming to feel "threatened" by the mere presence of Jared's brother in the auto parts house. Both Beverly and Jacob Padgett report ongoing fear of Deputy Runnels and others.

34.    Prior to his employment with the Simpson County Sheriff's Department, Deputy Runnels was involved in a fatal vehicular incident as a Smith County deputy, wherein he struck and killed a child while operating a vehicle at an obscene rate of speed in excess of any such speed needed.   Runnels faced no criminal or disciplinary consequence for that incident, nor did he receive any corrective or rehabilitative training.

Sheriff Mullins hired and retained Runnels as a deputy notwithstanding this history of reckless law-breaking.

35.    It is unknown whether Simpson County Sheriff's Department Deputies wore body cameras during this incident. It is also unknown whether the Deputies' vehicles were equipped with dash cameras recording these events.  The existence of body camera or dashcam footage from vehicles present at the scene has never been confirmed by the Defendants. The Simpson County Sheriff's Department and Sheriff Mullins have refused all communication with the Padgett family and have not responded to inquiries from counsel.

36.    The Mississippi Bureau of Investigation ("MBI") informed the family that only Deputy Runnel's final use of deadly force was within the scope of its investigation, and that all prior tasing and use of force was irrelevant to its review. The investigation has not been closed and has been referred to the Attorney General for grand jury presentation.  No one but Defendants appear to have any idea of the status of any investigation, assuming there was even one at all.

37.    The Padgett family has never received an autopsy report, has never been told how many times Jared was shot, and has received no

information from the Simpson County Sheriff's Department regarding the circumstances of Jared's death. Shockingly, Plaintiffs were informed of Jared's death by a Magee Police Department officer who drove to Jacob's residence and stated only: "He's gone." Beverly Padgett was never able to view her son's body because of its brutalized and disfigured condition from all of the violence perpetrated upon him.

38. As a direct and proximate result of Defendants' conduct, Jared Padgett suffered severe physical injury, extreme pain, and death. Beverly Padgett has suffered profound, lasting, and debilitating grief and emotional trauma, including the inability to continue her teaching career of over forty years, and carries the permanent memory of her son on his knees in gym shorts, begging not to be shot, as the last image she has of him alive. Jacob Padgett suffered severe emotional trauma requiring extended family medical leave from his ICU nursing position and continues to fear for his safety in the presence of Deputy Runnels and others.

**COUNT I: VIOLATION OF 42 U.S.C. § 1983 – FOURTH AMENDMENT EXCESSIVE FORCE (Against Defendants Seghini, Runnels, Thurman, Miller, and John Does 1–10, Individually)**

17

39.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

40.    Defendants Seghini, Runnels Thurman, Miller, and John Does, acting under color of state law, deprived Jared Padgett of his clearly established right to be free from unreasonable seizures and excessive force under the Fourth Amendment, as made applicable to the States through the Fourteenth Amendment.

41.    Under *Graham v. Connor*, 490 U.S. 386 (1989), the reasonableness of force is evaluated by the totality of the circumstances, including the severity of the alleged offense, whether the suspect posed an immediate threat, and whether the suspect was actively resisting. All three factors weigh decisively against Defendants: Jared had committed no crime, posed no imminent threat, and had fully and repeatedly surrendered—on his knees with hands interlaced behind his head, begging not to be shot—with his mother standing within arm's reach.

42.    The deployment of a taser at least 16 times within ten minutes, against a non-resisting, surrendering individual, constitutes excessive force *per se*. The repeated tasing of Jared Padgett was objectively unreasonable and constituted a continuing constitutional

18

violation. No reasonably trained officer could have believed this course of conduct to be lawful.

43.    Deputy Runnel's use of deadly force was unreasonable under *Tennessee v. Garner*, 471 U.S. 1 (1985), which authorizes deadly force only where an officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury.  Jared posed no threat of any sort to anyone.

44.    The situation that Runnels claimed to justify lethal force was itself created by the deputies' own unconstitutional conduct: the repeated tasing of a non-threatening, surrendering individual; the failure to handcuff or restrain Jaceb for medical evaluation and assistance, despite multiple opportunities to do so; and Deputy Miller's decision to allow the taser-ridden Jared Padgett to sit, unrestrained in a patrol vehicle alongside an unsecured AR-15, and then leave Jared there with the keys in the ignition.  But for these amassing illegal acts of Defendants, the fatal confrontation would never have occurred.  It is like a comedy of errors, but it was not comedy and resulted in the brutal murder of Jared because of Defendants' gross incompetence and illegal conduct.

45.    These violations were willful, malicious, and in reckless disregard of Jared Padgett's constitutional rights, and are actionable under 42 U.S.C. § 1983.

## COUNT II: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT FAILURE TO PROVIDE MEDICAL CARE
### (Against Defendants Seghini, Thurman, Miller, Runnels, and John Does 1–10, Individually)

46.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

47.    When law enforcement officers take a person into custody or create a medical emergency through their own conduct, they assume a constitutional duty to ensure access to timely and adequate medical care. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239 (1983).

48.    Defendants directly caused Jared Padgett's severe physical injuries through repeated tasing. These Defendants were constitutionally obligated to summon medical assistance. Beverly Padgett had expressly warned Deputy Seghini that she feared Jared would die without medical help. Seghini's response was to take no protective action, and then to repeatedly tase a surrendering young man.

20

49.    Following the shooting, no effort to render medical aid to Jared was made. The paramedic who responded told Jacob Padgett that Jared had "been gone for a while" when the ambulance arrived.

50.    Defendants' deliberate indifference to Jared Padgett's serious medical needs before, during, and after the use of lethal force, and Jared's ultimate homicide at the hands of Defendants, violated the Fourteenth Amendment and is actionable under 42 U.S.C. § 1983.

## COUNT III: VIOLATION OF 42 U.S.C. § 1983 – MONELL MUNICIPAL LIABILITY (Against Defendant Simpson County and Sheriff Mullins in his Official Capacity)

51.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

52.    Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a local governing body is liable under § 1983 when a constitutional violation results from an official policy, custom, or practice, or from a failure to train, supervise, and discipline employees.

53.    Defendant Simpson County, through Sheriff Mullins, maintained customs, policies, and/or practices that caused the constitutional violations described herein, including but not limited to: (a) failure to train deputies on appropriate responses to individuals in

21

mental health crisis; (b) failure to train deputies on constitutional limitations on use of force, including the prohibition on tasing non-resisting, surrendering individuals; (c) failure to require that non-law enforcement persons allowed in patrol vehicles be handcuffed or otherwise secured, and that firearms within those vehicles be secured; (d) failure to train on the constitutional obligation to provide medical care to persons whose medical emergency was created by law enforcement; and (e) failure to supervise and discipline deputies who engage in unconstitutional conduct.

54.    These failures were a direct and proximate cause of Jared Padgett's injuries and death, and are actionable under 42 U.S.C. § 1983 and 28 U.S.C. § 1367.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

65.    Trial by jury on all issues so triable;

66.    General and special compensatory damages, in an amount of no less than $150,000,000.00;

67.    Punitive damages against the individual Defendants in their individual capacities, in an amount to be set by the jury;

22

69.     Award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

70.     Pre- and post-judgment interest as permitted by law;

71.     Such further and other relief as this Court deems just and proper.

Dated April 1, 2026.

**PLAINTIFFS BEVERLY AND JACOB PADGETT**

BY: */s/ Bradley S. Clanton*
BRADLEY S. CLANTON; MSB #10505

Bradley S. Clanton (MSB # 10505)
CLANTON LAW FIRM PLLC
2735 Clarkson Road
Eupora, Mississippi 39744
Direct (601) 454-8794
brad@clantonlawms.com
www.clantonlawms.com

23